UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA							Plaintiff

v.										Criminal Action No. 3:21-CR-44-RGJ-CHL

BRANDON WASHINGTON,								Defendants
JAVONTE GRANT

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Brandon Washington ("Washington") moves to suppress all evidence derived from a search warrant issued for Washington's residence and for a *Franks* hearing. [DE 90 at 390]. The United States responded, [DE 91], and Washington replied. [DE 99]. Washington also filed a supplemental reply as permitted by the Court. [DE 105]. This matter is ripe. For the reasons below, Washington's Motion is **DENIED**. [DE 90].

## BACKGROUND

In July 2019, the Federal Bureau of Investigation ("FBI") began investigating individuals for narcotics trafficking and illegal possession of firearms stemming from a gang related homicide. [DE 51 at 190; DE 51-3 at 230; DE 53 at 251]. The FBI identified Washington and co-defendant, Javonte Grant, as potential witnesses. *Id.*

On March 15, 2021, the Federal Bureau of Investigation filed a criminal complaint alleging that Grant and Washington possessed firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). [DE 1 at 17]. Both were prohibited from possessing firearms because of previous felony convictions. [*Id.* at 3-4]. Based on the criminal complaint, arrest warrants were issued for Grant and Washington. [DE 2; DE 3]. That same day, March 15, the FBI applied for a search warrant for Washington's residence ("Search Warrant"). [DE 91-1 at 417]. FBI Agent Ronald A.

1

Hornback, Jr. ("Hornback") submitted a 21-page affidavit in support of the Search Warrant. [*Id.* at 418-437]. Hornback made many statements in the affidavit, including the following, as probable cause:[1]

- In late July of 2019, the FBI began conducting a federal investigation targeting individuals trafficking illegal narcotics and illegally possessing firearms that stemmed from a gang related homicide that occurred on July 8, 2019. Through telephone analysis, witness statements, and other investigative techniques, the FBI believed the homicide may have been retaliatory violence from rival drug dealers. The FBI has identified possible subjects.
- Throughout the course of that federal investigation, the FBI identified that Grant and Washington were potential witnesses and possessed useful information related to the gang related homicide. . . .
- The FBI began monitoring the Instagram account, "Kingwooda23 (IG Account)" which is used by Grant. The IG Account is a publicly available social media account that anyone can view.
- A Snapchat account was identified for Washington. The Snapchat account for Washington is listed under user, "B.Wash10k (Snap Account).". . .
- On November 8, 2019, the FBI interviewed Grant at the office of Jefferson County Probation and Parole in Louisville, Kentucky. Grant indicated that he was friends with Washington. . . .
- Of note, the FBI knows from monitoring the IG Account over an extended period of time, GRANT almost always includes language similar to "#BDA!! #10k!! # FL!!" after every posting. For example, the FBI observed a post on the IG ACCOUNT on February 18, 2021 that included a picture of GRANT. The posting does not display any criminal activity but the comment post includes the specific language of "#BDA!! #10k!! # FL!!." (See Photo 4). The FBI suspects from reviewing the social media account of Grant that #BDA is an acronym for Beyond Dreaming Associations. This is believed to be a business endeavor of Grant. The FBI believes the #10k is related to a business registered to Washington within the state of Kentucky called 1OFAKINDPROPERTIES LLC. The Snap Account username of Washington also includes "10K" as referenced in Paragraph 14. Including this language could possibly indicate Grant is showing support for the business endeavor of Washington as they are friends. . . .
- On February 25, 2021, the FBI observed a video posted to the IG Account, the video displayed several suspected firearms on a table at the Louisville Armory Gun Range (LAGR) in Louisville, Kentucky. The FBI could visually identify an AR-15 style pistol and two Glock style pistols (See Photos 5 and 6). The video snippet was captioned "Long distance watch me work !! #BDA!! #10k!! # FL!!." The FBI believes that statement is indicative that Grant is potentially getting ready to fire weapons at targets inside a gun range. . . .
- Knowing Grant and Washington are friends, the FBI reviewed the social media of Washington and observed a similar posting that displayed a range target similar to Photo 8

---

[1] For ease of reading, the Court has removed capital letters and emphasis from the following quotations.

at a gun range (See Photo 9). Washington could not be visually identified in the social media posting.
- After the FBI observed a posting from the IG Account, members of the FBI traveled to the LAGR to attempt to locate Grant and/or Washington in the event they were still there with negative results. The FBI did briefly speak to one or two employees who confirmed Grant was there with Washington but did not take any official statements. The FBI scheduled a time to come back the following day to talk to employees and recover the surveillance.
- On February 26, 2021, the FBI returned to the LAGR and spoke to D.M. who was able to pull surveillance footage from numerous cameras. The FBI identified Grant as one subject and identified Washington as the second subject. Grant and Washington entered the facility carrying a rifle bag and a long white box which would typically contain long guns. Grant and Washington were wearing masks typically worn during the Covid-19 pandemic.
- The two arrived in a black Chevy Malibu with chrome wheels matching the description of the vehicle registered to Washington. Washington was observed exiting the driver-side of the vehicle upon arrival.
- The two enter the facility, they purchase targets and other items, enter the firing range, affix range targets, place multiple firearms on the shooting table, load the various weapons, and operate the weapons. . . .
- From the surveillance video, the FBI obtained the following images of Washington handling and firing a handgun and AR-style pistol (See Photo 12). The FBI was able to capture the muzzle flash from the AR pistol.
- Additionally, the FBI observed in the surveillance video the moment where Washington seemingly utilized his cellular device to take pictures and/or video that was observed on the IG Account (See Photo 13) and previously mentioned.
- The FBI interviewed D.S who recognized Grant and Washington from photos provided to him by the FBI. D.S. said he only dealt with Grant primarily. D.S. advised that Grant paid for both individuals to shoot at the range. D.S. disclosed that he sold Grant several boxes of .45 ACP, .40 caliber ammo, and 5.56 ammo rounds. D.S. specifically recalled asking Grant if they needed ammunition or if they brought their own. According to D.S., Grant said they needed to buy ammunition. D.S. handed Grant the boxes and observed him take the ammunition. D.S. could recall the specific quantity, make, and model of the ammunition he sold Grant which matched the sales receipt. D.S. knows based on his training and experience that the ammunition he provided to Grant was live ammunition.
- The FBI also spoke to another employee, T.G., who identified Grant and Washington from photos provided by the FBI. T.G. could recall specific clothing worn by Grant but could not describe the clothing worn by Washington. T.G. said he advises the two about certain safety precautions to follow while shooting in the range. T.G. recalled the Grant and Washington brought two long guns and three pistols which was consistent with the surveillance video. T.G. stated he kept an eye on them due to the lack of shooting etiquette which is also why he could recall certain details about Grant and Washington. T.G. stated that he knew from his training and experience that both Grant and Washington brought and operated real functioning weapons with live ammunition. . . .
- Additionally, Washington utilized a cellular device to capture images of his visit to the range which is clearly displayed in the surveillance video. The FBI knows from training and experience that his electronic device may result in attributable evidence. For example, the images that Washington captured on his device is likely retained on the device.

3

- Moreover, it is typical that modern "smart phones" utilize a cloud account that retains digitally created pictures or videos that can be accessed by a laptop or desktop computer connected to the internet. A digital device also contains location information that can be analyzed to determine the location of Washington during his visit to the LAGR. Text messages and call logs may display the communication between Grant and Washington leading up to them meeting to drive to the LAGR. Lastly, the FBI knows based on training and experience that individuals who possess firearms, legally or illegally, will often times capture and retain digital images to share with others or use the digital image to advertise the firearm for sale. All of the aforementioned information provided, relative to electronic devices, can be digitally extracted by law enforcement with available computer software. The FBI also knows based on training and experience that digital devices are almost always located in a residence, a vehicle, or on the person. Therefore, the FBI would request authority to locate electronic evidence and forensically search the digital items.
- Lastly, the LAGR video surveillance displayed that Washington arrived in a vehicle matching the description of the Target Vehicle with at least two firearms. The FBI knows from training and experience that these items are typically stored either in their residence or vehicle. Like many citizens, people possess firearms for protection and will keep them on their person as they drive in a vehicle. Alternatively, individuals will keep store firearms inside a residence for home protection and storage reasons. Lastly, the FBI wishes to recover the weapons to keep them out of the hands of prohibited persons.
- Based on my training and experience, I am aware that firearms, unlike various forms of controlled substances and contraband, are not consumed in use, and are typically stored in residences, vehicles or places of safe haven for extended periods of time. Firearms also have an intrinsic monetary value, which is often accompanied by historic vale. Firearms are usually secured by the possessor in safe places to prevent theft, loss, or damage.

[*Id.* at 419-37]. The affidavit included screen captures from Grant and Washington's social media accounts and LAGR surveillance video. [*Id.* at 418-36]. Hornback identified the property to be searched as Washington's apartment, where he lived with his girlfriend, and his vehicle, a Chevy Malibu. [*Id.* at 434, 438-39]. Based on Hornback's affidavit, a Magistrate Judge found probable cause and authorized the Search Warrant. [*Id.* at 417].

On May 11, 2021, a grand jury indicted Washington on one count of possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(c), two counts of possession of ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(1), 924(a)(2), and (2), one count of possession of a firearm by a prohibited person in violation of 18

U.S.C. § 922(g)(1) and 924(a)(2), and one count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). [DE 27].

## DISCUSSION

Washington challenges the validity of the Search Warrant because (1) his association with Grant should not have been used to establish probable cause, and (2) the identification made by the gun range employee was unduly suggestive. [DE 90 at 393-99]. As a result, Washington moves to suppress "all evidence, any developed probable cause, and any statements made during or after the" search pursuant to the Search Warrant. [*Id.* at 390]. He also moves for a *Franks* hearing alleging that the affidavit omitted material facts. [*Id.* at 389-400]. The United States opposes the motion, arguing Washington has not met his burden for a *Franks* hearing and that the Search Warrant was supported by probable cause. [DE 91 at 404-15].

**I.     Motion to Suppress**

*i.     Standard*

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir. 1975)). Suppression of a constitutionally defective search is inappropriate where the good-faith exception to the exclusionary rule applies. *United States v. Leon*, 468 U.S. 897 (1984).

"The Fourth Amendment does not require probable cause to believe evidence will conclusively establish a fact before permitting a search, but only 'probable cause . . . to believe that the evidence sought will aid in a particular apprehension or conviction.'" *Messerschmidt v. Millender*, 565 U.S. 535, 552 n.7 (2012) (alteration in original) (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).  An "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

The Sixth Circuit has held that "statements of victims and eyewitnesses of crimes are entitled to a presumption of reliability and veracity without independent corroboration." *United States v. Ingram*, 985 F.2d 562 (6th Cir. 1993).  An officer may rely on an eyewitness identification to establish probable cause unless "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (citing *Rainer v. Lis*, 16 F.3d 1221 (6th Cir. 1994)); *see also United States v. Amerson*, 38 F.3d 1217, 3 (6th Cir. 1994) *and Ahlers*, 188 F.3d at 371 ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.").  Eyewitness statements are generally entitled to a presumption of reliability and veracity because they are based on firsthand observations. *Ahlers*, 188 F.3d at 370.  Another indicium of reliability is "corroboration of the tip through the officer's independent investigative work." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996). While Sixth Circuit "precedent does not require independent corroboration of criminal activity . . . [c]orroboration of specific nonobvious information that, although innocent on its own, meshes

with an informant's tips is similarly relevant." *United States v. Hines*, 885 F.3d 919, 925 (6th Cir. 2018) (emphasis in original).

When evaluating the merits of a motion to suppress, the responsibility of a reviewing court is simply to ensure that the warrant-issuing judge "had a 'substantial basis' for concluding that probable cause existed." *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238–39). When reviewing that determination, this court should give "great deference" to the warrant issuing judge's determination of probable cause and "reverse that decision only if it was arbitrarily made." *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009). When determining whether probable cause existed for issuing a warrant, a reviewing court is to avoid an "excessively technical dissection of . . . isolated issues" and instead examine the "totality of the circumstances" contained with the warrant affidavit. *Illinois v. Gates*, 462 U.S. 213, 234–35 (1983).

"It is well settled that in seeking suppression of [physical] evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant's burden extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014), *as amended* (Oct. 21, 2014).

    *ii.*    *Analysis*

Washington argues that the affidavit fails to establish probable cause. [DE 90 at 393-99]. The United States disagrees. [DE 91 at 404-409].

The Court looks at the totality of the circumstances within the affidavit, deferring to the issuing magistrate's finding of probable cause. The affidavit included images from Grant's IG

Account, Washington's Snap Account, and still images from the gun range surveillance video, as well as eyewitness accounts from gun range employees that Washington was carrying firearms, ammunition, or both. [*Id.* at 427-36]. The Sixth Circuit has consistently held that a magistrate may infer a nexus between the place to be searched and the evidence sought, based on the nature of the evidence and the type of offense. *See, e.g.*, *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008) ("an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence"); *United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009) ("it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence"). Based on this evidence, it was reasonable for the magistrate to infer that Washington would keep guns in his cars or residence. *Williams*, 544 F.3d at 688; *Gunter*, 551 F.3d at 481. The Court turns to Washington's argument that omitting facts change this probable cause analysis.

On the issue of the identification, Washington argues that, as a single photo identification, it was unduly suggestive and cannot be used to support probable cause. [DE 90 at 394-95]. The United States argues that a totality of the circumstances establishes probable cause. Here, Hornback disclosed the relevant methodology in his affidavit, which included both the identification from the gun range employee, and FBI agent's independent identification of Washington from the surveillance footage based on prior investigations. [DE 91 at 404-09; 91-1 at 429-33].

Washington argues that the Court should use a two-prong analysis to determine whether a pretrial identification should be suppressed as unduly suggestive. [DE 90 at 394-95]. But Washington "has provided no support for his position that this principle should be applied in the context of an affidavit supporting a search warrant, nor has the Court been able to identify any such authority." *United States v. Malone*, No. 5:19-CR-22-TBR, 2020 WL 132521, at *4 (W.D.

Ky. Jan. 10, 2020) (under similar circumstances rejecting defendant's proposed "unnecessarily suggestive" analysis and instead analyzing the informant's credibility as described in the affidavit). The Court thus declines to apply the "unnecessarily suggestive" due process analysis to the identification in the affidavit and instead analyzes whether the photo identification should be excluded from the affidavit because it is unreliable as described in affidavit.

The affidavit identifies two individuals who identified Washington by photo, D.S. and T.G. Both were apparently employees at the gun range Defendants allegedly visited. [DE 91-1 at 433]. The affidavit states that D.S. "sold Grant several boxes" of ammunition and that T.G. "recalled that Grant and Washington brought two long guns and three pistols, which was consistent with the surveillance video." [*Id.*]. D.S. and T.G. are eyewitnesses, and as a result, their identifications are entitled to a presumption of reliability and veracity. *Ahlers*, 188 F.3d at 370.

The affidavit gives more detail on the identification, stating that D.S. "recognized Grant and Washington from photos provided to him by the FBI [and] dealt with Grant primarily." [DE 91-1 at 433]. It states that T.G. also "identified Grant and Washington from photos provided by the FBI." [*Id.*]. The affidavit includes that T.G. "kept eye on them due to the lack of shooting etiquette which is also why he could recall certain details about Grant and Washington" and that the employee "knew from his training and experience that both Grant and Washington brought and operated real functioning weapons with live ammunition." [*Id.*]. Based on the affidavit, D.S. and T.G. based their knowledge on the photos shown them by the FBI and from having seen Defendants at the gun range the day before. [*Id.* at 429-33]. T.G.'s identification is strengthened because T.G. was paying particular attention because of their "lack of shooting etiquette." [*Id.* at 433]. The affidavit also states that the FBI corroborated the employees' identification of Defendants, independently identifying Washington from the surveillance footage. [*Id.* at 429-30].

9

Thus, not only are the eyewitness identifications entitled to a presumption of reliability and veracity, but the FBI also independently verified the identifications. *Ahlers*, 188 F.3d at 370; [DE 91-1 at 429-30]; *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) ("information received from an informant whose reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information"). And even if Washington were correct that the eyewitness identification should be struck from the affidavit, this does not strip the affidavit of probable cause, because not only did the FBI corroborate the identification, but the affidavit also has other sources of probable cause in addition to the gun range employee identification.

Washington's argument that the affidavit improperly attempts to establish probable cause because of his association with Grant also fails. Washington argues that if "the information related to Grant were to be removed from the affidavit . . . there would be little to nothing for the United States to rely upon to establish probable cause." [DE 90 at 393]. Indeed, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 86 (1979). But as the United States argues, the affidavit ties Washington to Grant through their social media activity and the gun range surveillance video. [DE 91 at 407-08; DE 91-1 at 425-436]. And as already discussed, the affidavit included probable cause other than just Washington's association with Grant. The affidavit therefore contains more than simple proximity between Grant and Washington and thus did not improperly establish probable cause only because of his association with Grant. Thus, considering the totality of the circumstances, the affidavit provided probable cause for the Search Warrant.

Because the Search Warrant was supported by probable cause, the Court need not determine whether the good-faith exception applies. But for the sake of completeness, the Court considers Washington's argument that the good-faith exception does not apply here. [DE 90 at 399]. While Washington does not develop an explicit argument, he implies that the good-faith exception does not apply because Hornback lied or omitted facts to obtain the Search Warrant. [*Id.*]. As discussed below, there is no evidence of this, and the Search Warrant is supported by probable cause.

The good-faith exception would apply if the Search Warrant was invalid for lack of probable cause. The Supreme Court explained that a court should not exclude evidence when an officer's reliance on a warrant later found to lack probable cause was objectively reasonable. *Leon*, 468 U.S. at 922. *Leon* identified four situations in which an officer's reliance on a later invalidated search warrant *could not* be considered objectively reasonable: (1) when the warrant is issued based on an affidavit that the affiant knows contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid. *Id.* at 922–23.

Here, there is neither evidence—nor does Washington develop any argument beyond the falsehood argument discussed in a separate section and analyzed by the Court below—that any of the four *Leon* situations apply. There is no evidence that the affidavit in the Search Warrant reflected information Hornback knew was false, that the issuing magistrate was serving as a rubber stamp, that the affidavit was objectively unreasonable, or that the Search Warrant was facially

deficient. As a result, even if the Search Warrant were not supported by probable cause, the *Leon* good-faith exception would apply, and suppression of the Search Warrant would be inappropriate.

## II. *Franks* Hearing

Washington argues he is entitled to a *Franks* hearing on his motion to suppress because there are false statements and omissions in the affidavit that undermine the probable cause. [DE 90 at 389-400]. He argues that a single photo ID was unduly suggestive and that the affidavit improperly used his association with Grant and omitted prejudicial material facts. [*Id.* at 393-99]. The United States argues that Washington did not make a substantial preliminary showing of deliberate falsehood or reckless disregard for the truth and that, even if he did, none of Washington's claims support a finding that probable cause did not exist. [DE 91 at 409-411].

### i. Standard

To be entitled to a *Franks* hearing, a defendant must (1) "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001) (citation and internal quotation marks omitted). The Sixth Circuit's "well-settled framework for Franks hearings requires a defendant to 'point to specific false statements' and then 'accompany his allegations with an offer of proof.'" *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (quoting *United States v. Cummins*, 912 F.2d 98, 101, 103 (6th Cir. 1990)). A defendant must prove falsity or reckless disregard for the truth by a preponderance of the evidence. *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006). "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks v. Delaware*, 438 U.S. 154, 155 (1978).

For alleged omissions "to be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have undermined the showing of probable cause." *United States v. Carpenter*, 360 F.3d 591, 596–97 (6th Cir. 2004). Officers need not divulge every piece of exculpatory evidence in the affidavit. *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) ("To interweave the Brady due process rationale . . . places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail . . . to prove the negative proposition that no potentially exculpatory evidence had been excluded."). As a result, "[a]lthough material omissions are not immune from inquiry under *Franks*, we have recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant . . . entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Peet v. City of Detroit*, 502 F.3d 557, 571 (6th Cir. 2007) n. 3 (6th Cir. 2007).

A Franks hearing is not required if the allegedly false statement in the warrant affidavit is unnecessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). In other words, if there is sufficient content to support a finding of probable cause remaining in the warrant affidavit after "material that is the subject of the alleged falsity or reckless disregard is set to one side," no *Franks* hearing is required. *Id.* at 171–72.

    ii.    *Analysis*

Washington contends that the "affidavit improperly attempts to establish probable cause that Washington illegally possessed firearms because of his association with Grant." [DE 90 at 393]. Washington argues that Hornback "failed to disclose that only one of several employees said he remembered the Defendant and then only after the employee was shown a single photo of Washington [in which he] was wearing a mask." [*Id.* at 397]. Washington argues that "Hornback depicted Washington in the worst possible light . . . engaged in grandiose hyperbole . . . [and] omits his relationship with the Jefferson Police Department. [*Id.* at 396-97]. Washington also argues Washington argues Hornback "omitted the fact that the video of the 'suspect's car' did not capture his license plate or any other identifying features." [*Id.* at 397]. And Washington argues that "paragraph 35 of the affidavit was a complete misstatement of fact [because] Washington does not have an Instagram account and there is no evidence to establish Washington used his phone to take photos at the gun range." [*Id.*].[2] Washington also argues that the affidavit's statement that "the first time the FBI knew where Washington lived was on February 25, 2021 . . . is contradicted . . . when Washington was told that law enforcement had been surveilling him for three or four months nonstop, day and night." [DE 105 at 546].

Washington does not allege that his association with Grant was false. [DE 90 at 393-94]. Nor does he allege that the photo ID putting him at the gun range was false. [*Id.* at 394-99]. In his motion, Washington makes one allegation of falsehood in the affidavit about the Instagram

---

[2] At oral argument on August 4, 2022, Washington also asserted that Hornback told Washington in a recorded interview that the FBI had been tracking Washington's every movement on the day of and before Washington and Grant were allegedly at the gun range. [08/04/2022 Hearing Transcript 6:01-7:13]. The United States responded that no evidence exists showing that Washington was being tracked on that specific date, and if such evidence existed the United States would have been required to—and would have—turned it over to Washington. [Transcript 11:1-18]. Washington argued in rebuttal that regardless, the affidavit contains a false statement because it "says the first time [the affiant] figured out where [Washington] lived was February 25th." [Transcript 19:1]. The Court granted Washington leave to supplement his original motion which did not include this information or evidence. [Transcript 19:6-10]. Washington filed a supplemental reply. [DE 105].

14

account. [*Id.* at 397-98]. In his supplemental reply, Washington adds two allegations of falsehood, one about the affiant's identification from the surveillance videos and the second regarding the date his address was identified. [DE 105 at 545-46]. As to the Instagram account, Washington argues that Hornback's statement "Washington seemingly utilized his cellular device to take pictures and/or video that was observed on the IG Account" was false because Washington "does not have an Instagram account." [DE 91-1 at 432; DE 90 at 397]. But the affidavit does not suggest the "IG Account" belongs to Washington, it states that it "is used by Grant." [DE 91-1 at 421]. And Washington does not allege or show that he did not use "his cellular device to take pictures and/or video that was observed on the" Instagram account. [*Id.* at 432; DE 90].

Washington also alleges that the affidavit "states that the first time the FBI knew where Washington lived was on February 25, 2021. . . . This statement is contradicted by arresting officer [sic] who interviewed Washington on or about March 24, 2021 . . . when Washington was told that law enforcement had been surveilling him for three or four months nonstop, day and night." [DE 105 at 546]. That said, law enforcement may misrepresent evidence when attempting to elicit a confession from a suspect. *Frazier v. Cupp*, 394 U.S. 731 (1969). Thus, particularly as the United States represented at the August 2022 hearing that no such evidence exists, this evidence alone is not enough to show that Washington was being surveilled, that the statement about his residence was false, or that the affidavit contains false information.[3]

Washington also argues that the affiant's "observations" of him from the surveillance video are unverifiable and incorrect because there are no pictures showing his face—the videos show someone "whose face was substantially covered by a COVID 19 mask" and the screenshot in the

---

[3] Even if the statement related to Washington's residence was shown to be false, Washington would need to show that removing this evidence from the affidavit would alter the probable cause determination. *Graham*, 275 F.3d at 505. Washington has not done so here, and the Court finds even if the affidavit were redacted, it would fail to impact the probable cause.

affidavit does not "show the subject's fact at all." [DE 105 at 545]. The affidavit includes that the suspect was wearing a "mask [as] typically worn during the Covid-19 pandemic," and includes the screenshot itself from the video surveillance showing the suspect's head. [DE 91-1 at 429-33]. Thus, again, Washington has not shown this is a falsehood.[4]

"The alleged false or misleading statement must be later shown to be false to warrant a Franks hearing." *United States v. Sinclair*, No. CR 13-20829, 2017 WL 3977888, at *3 (E.D. Mich. Sept. 11, 2017) (citing *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014)). "The burden falls upon [Washington] to establish falsehoods by a preponderance of the evidence." *United States v. Salazar*, No. CRIM.A.3:06CR112H, 2006 WL 3859250, at *8 (W.D. Ky. Dec. 28, 2006) (citing *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006)). Washington has thus not carried his burden on any argument of falsehood.

For his arguments of omission, Washington must show that they were "deliberately or recklessly omitted and [] undermined the showing of probable cause." *Carpenter*, 360 F.3d at 596–97. These arguments carry a higher burden than his argument of falsehood. *See, e.g.*, *United States v. Fowler*, 535 F.3d 408, 415–16 (6th Cir. 2008) ("Allegations of material omission are held to a higher standard because of the potential for endless rounds of *Franks* hearings due to potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.") (internal citations omitted); *and United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) ("a *Franks* hearing is only merited in cases of omissions in 'rare instances'").

Washington argues that "Hornback obscured facts in an effort to mask an affidavit woefully deficient in probable cause." [DE 90 at 396]. He contends that Hornback omits facts about the

---

[4] Neither is it an omission.

identification: only one of several employees remembered or identified Washington, only one photo was shown, the suspect was wearing a mask, and that there were no identifying features of the suspect's car, of which there are likely thousands matching the description. [*Id.* at 397]. Washington argues that by omitting (and including) this methodology, the probable cause in the affidavit was undermined. [*Id.* at 394-99]. Yet the affidavit does contain some facts Washington complains about: that the suspect was wearing a "mask [as] typically worn during the Covid-19 pandemic," that "one or two employees [] confirmed" Washington was at the gun range, and that the suspect's vehicle "match[ed] the description" of Washington's vehicle. [DE 91-1 at 3]. The affidavit does not contain exactly how many photos were provided or whether those photos have face masks. The affidavit also does not have all of Washington's history with the police.[5] These are omissions. "A Franks violation, however, does require a showing of intent, i.e., a "deliberate falsehood" or "reckless disregard for the truth."" *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (citing *Franks*, 438 U.S. at 171). For any of these omissions to warrant a Franks hearing, Washington must make a "strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is *critical* to the finding of probable cause." *United States v. Hampton*, 760 F. App'x 399, 405 (6th Cir. 2019) (emphasis

---

[5] Washington contends:
> Hornback omits his relationship with the Jeffersonville Police Department (an agency Hornback has clearly worked in concert within this investigation) and the agency's long and unsuccessful history in trying to convict Washington for crimes he didn't commit.
>> 1. That he directed that Washington be pulled over by the Jeffersonville PD in Jeffersonville in 2020 and his vehicle was searched with negative results.
>> 2. That in 2018 Washington was acquitted on assault, attempted murder and other charges in Louisville after serving three years in county jail awaiting trial on such charges.
>> 3. That Washington was wrongly charged with robbery in Jeffersonville in 2015 where the charges were dismissed two weeks later after it was established that Washington was at another location at the time of the crime.

[DE 90 at 397]. While neither the motion nor the affidavit includes Hornback's specific "relationship" with the Jeffersonville Police Department, it seems obvious that the issuing magistrate would have known that law enforcement agencies work cooperatively.

added). Washington includes nothing with his motion that would allow the Court to infer reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 155 (1978) ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."). The mere existence of omissions is insufficient to make a "strong preliminary showing" that the affiant intended to mislead the issuing judge with his omissions. *Hale v. Kart*, 396 F.3d 721, 727 (6th Cir. 2005). The Court thus finds that Washington fails to make a "strong preliminary showing" that Agent Hornback omitted material information "with an intention to mislead." *Mays*, 134 F.3d at 816.

And the omissions would not satisfy the second requirement for a Franks hearing because the added information would have had no impact on the finding of probable cause—the inclusion of the methodology and Washington's history with the police in the affidavit would not negate the probable cause. Thus, Washington's Motion for a Frank's Hearing [DE 90] is **DENIED.**

## CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

1) Washington's Motion to Suppress and for a *Franks* Hearing [DE 90] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

August 12, 2022

Cc: Counsel of record

18